# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DANIEL CARNEVALE, | : |
| Plaintiff, | : No. 2:22-cv-341 |
| v. | : |
| JENNIFER DIGIOVANNI, SCOTT EVANS, and J.R. SMITH, | : **JURY TRIAL DEMANDED** |
| Defendants. | : |

## **COMPLAINT**

Plaintiff Daniel Carnevale files this Complaint as follows:

## **INTRODUCTION**

1. This action arises from the malicious prosecution of Mr. Carnevale for a crime that investigators and prosecutors alike knew he did not commit. Nevertheless, Defendants Scott Evans ("Evans"), J.R. Smith ("Smith"), and Jennifer DiGiovanni ("DiGiovanni") fabricated evidence, withheld material exculpatory evidence, and orchestrated the use of false testimony from an alleged jailhouse informant to wrongfully convict Mr. Carnevale and sentence him to more than three lifetimes without the possibility of parole. Mr. Carnevale's conviction was part of the disturbing resurrection of a tragic fire that occurred some 13 years prior, where there was no reliable evidence that the fire was caused by arson, let alone that it was intentionally set by Mr. Carnevale. Mr. Carnevale was exonerated of his wrongful conviction after serving nearly 14 years in prison. This action asserts that DiGiovanni, Evans, and Smith violated Mr. Carnevale's constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution to be free from a malicious prosecution and/or fabricated evidence.

## JURISDICTION AND VENUE

2. This action is brought under the Fourth and Fourteenth Amendments to the United States Constitution pursuant to the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1983. This Court has jurisdiction over these claims under 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).

3. Venue is proper pursuant to 28 U.S.C. § 1391(b) because each claim arose in Allegheny County in the Western District of Pennsylvania.

## PARTIES[1]

4. Mr. Carnevale is an adult individual residing in Pennsylvania.

5. DiGiovanni is an adult individual employed as a Deputy District Attorney with the Allegheny County District Attorney's Office ("DA's Office"). The DA's Office maintains a principal place of business at 436 Grant Street, Pittsburgh, Pennsylvania 15219. At all relevant times, DiGiovanni was acting under color of state law in her investigative and/or administrative capacity, and in accordance with the policies, customs and/or practices of the DA's Office. DiGiovanni is sued in her individual capacity.

6. Evans is an adult individual employed as a detective with City of Pittsburgh's Bureau of Police (the "PBP"). The PBP maintains a principal place of business at 1203 Western Avenue, Pittsburgh, Pennsylvania 15233. At all relevant times, Evans was acting under color of state law, and in accordance with the policies, customs, and/or practices of the PBP. Evans is sued in his individual capacity.

---

[1] An administrative complaint was filed against the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.* (the "FTCA Complaint").

7. Smith is an adult individual employed as a detective in the PBP. The PBP maintains a principal place of business as stated above. At all relevant times, Evans was acting under color of state law, and in accordance with the policies, customs, and/or practices of the PBP. Evans is sued in his individual capacity.

8. DiGiovanni, Evans, and Smith are referred to collectively as "Defendants."

## FACTS

### *Fire and Arson Investigation (1993)*

9. On January 17, 1993, a devastating and deadly fire occurred at the Columbia Apartments at 220 Taylor Street (the "Columbia"), as well as the adjoined Regal Apartments at 230 Taylor Street (the "Regal"), in the Bloomfield neighborhood of Pittsburgh.

10. The cause of the fire was accidental.

11. The Columbia and Regal were adjoined and had a basement area that was shared by a large double doorway, while the two buildings formed an "L" shape to include a courtyard.

12. The Columbia basement included two apartments, recreation area, storage area, mechanical room, and an office, while the Regal basement included storage and repair equipment for both buildings.

13. An open-air shaft extended from the basement of both buildings to the roof.

14. Both buildings were structurally comprised of wood and steel beams.

15. Because steam pipes were used as the heat source in these apartments, and those pipes ran through and adjacent to the dimensional lumber, the wood, heated by the adjacent and exposed steam pipes, posed a common potential fire hazard with heating systems that were not properly working or maintained.

16. Tragically, in the early morning hours of January 17, 1993, the wood building components of the Columbia ignited because of a decrease in water volume in the building's heating pipes and a concomitant increase in steam temperature, which was caused by a malfunctioning or non-maintained boiler.

17. After the wood building components were ignited, fire progression followed the pipe chases and up the air shaft to the open attic roof, and then followed the natural air way down the closed air shaft and other pipe chases to the lower floors, while the contents of the apartments added to the fuel load.

18. The fire caused a total collapse of the northwest corner of the Columbia.

19. The fire caused the deaths of three residents, and serious injuries to another resident.

20. The accidental cause of the fire was clearly evidenced by several witnesses in the Columbia who described their observations immediately before the fire:

   a. Witness 1, who lived in a basement apartment, opened his apartment door, and felt heat in the hallway, although there were no signs of fire and smoke, he immediately heard the pipes in his apartment banging very loudly,

   b. Witness 2, who lived in a first-floor apartment, heard his water pipes banging and crashing before the fire, as well as what was described as a very loud noise resembling a chainsaw, and

   c. Witness 3, who live in a third-floor apartment, was awakened prior to the fire by something resembling very loud stereo static, which was immediately followed by loud banging noises coming from her radiator.

21. Witness 3, *supra*, also told investigators that she had a heating problem in her apartment two weeks before the fire that was supposedly fixed, however, as the week progressed leading up to the fire, her apartment was increasingly hot, and on the night of the fire it was "very high."

22. Several other witnesses who lived in the Columbia also stated that they heard loud clanging, pounding, and buzzing just before smelling any smoke.

23. William Petraitis ("Petraitis"), a Special Agent for the Bureau of Alcohol, Tobacco and Firearms ("ATF") was the lead fire investigator for the Columbia.

24. The ATF was the lead investigative agency for the fire.

25. Petraitis reviewed and understood all the foregoing witness statements, which established that the fire in the Columbia was accidental and not intentionally set.

26. Petraitis, however, intentionally falsified evidence by stating (and testifying) that he ruled out an accidental fire when he knew that he did not perform an appropriate investigation to assert the same.

27. Petraitis never took any legitimate steps to rule out an accidental cause of the fire.

28. Petraitis knew that there was no physical or chemical evidence supporting his conclusion that the fire was intentionally set.

29. Without any evidence of the same, Petraitis then falsely represented to other investigators that the fire was intentionally set, and therefore, that a criminal arson and homicide investigation should follow.

30. To support his claim that the fire was intentionally set, Petraitis falsely claimed that lacquer thinner was used as an accelerant to start the fire in the mechanical room of the Columbia.

31. Petraitis then told William Kinard ("Kinard"), a chemist for the ATF, to falsify his reporting to state that lacquer thinner was present in the mechanical room of the basement of the Columbia when it was not.

32. In response, Kinard intentionally (and falsely) determined in his chemical report that compounds of lacquer thinner were present in the area where Petraitis said they would be.

33. In preparation of Mr. Carnevale's criminal trial, Julia A. Dolan ("Dolan"), the Forensic Laboratory Chief of the ATF, conducted a review of Kinnard's findings on behalf of the ATF, wherein she disagreed with every one of Kinard's findings in connection with the presence of lacquer thinner.

34. Dolan's findings were then reviewed by her direct supervisor, Richard Strobel ("Strobel"), who said the levels were so low as to render them non-existent or meaningless.

35. Dolan, Strobel, and the ATF intentionally failed to provide this information to investigators and prosecutors and allowed the criminal trial to proceed in the face of these findings.

36. There has never been any valid and/or reliable chemical analysis to prove that lacquer thinner was used as an accelerant to start the fire at the Columbia, or that the fire originated anywhere but from the malfunctioning of the building's heating system, which caused the pipes in the building to overheat.

37. As of the date of Mr. Carnevale's arrest, the ATF was aware that Petraitis and Kinard colluded in at least two other cases (Kristine Bunch ("Bunch") in 1996, and Gregory Brown ("Brown") in 1997) to falsify evidence that fires were intentionally set when there was no reliable evidence of the same.

38. But again, the ATF intentionally withheld this exculpatory evidence and allowed Mr. Carnevale's criminal prosecution to proceed.

39. Bunch was exonerated in 2012.

40. Brown's sentence was vacated in 2014 after an appellate court's finding of an "avalanche of evidence" indicating official misconduct by the prosecution.

41. The fire investigation and original criminal prosecution of Brown also occurred in Allegheny County, Pennsylvania.

42. Because of the total collapse in the Columbia, heavy machinery and overhead cranes were used by the Pittsburgh Arson Squad, Pittsburgh Homicide Division, ATF, and Allegheny County Fire Marshalls, working in conjunction with one another, from January 17 through 28, 1993.

43. The ATF (and Petraitis) did not arrive until January 22, 1993.

44. Upon his arrival, Petraitis learned that a substantial volume of water was used during attempts to control the fire, which not only caused significant spoliation of evidence within the Columbia, but also tainted any chemical testing which might be performed in connection with the basement of the Columbia.

45. Petraitis also ordered that heavy machinery and overhead cranes be used to excavate the Columbia, which he knew would cause various accelerants to be artificially introduced into the fire investigation.

46. Despite the extensive contamination of the crime scene, there was still no reliable evidence to establish the presence of lacquer thinner.

47. Petraitis concealed the significance of fire control efforts, and excavation efforts, from criminal investigators so that they never considered it in their respective investigations.

48. The cause of the fire has never been revisited by any agency.

49. All the physical and chemical evidence from the investigation is destroyed.

50. At all relevant times, absent Petraitis' knowingly false reports, there would have been no allegation of criminal wrongdoing that led to the fire, and no criminal homicide investigation or any ensuing criminal prosecution.

*Cold Case Investigation and Arrest of Mr. Carnevale (2005-2006)*

51. In 2005, more than 12 years after the fire at the Columbia, William Mullen ("Mullen"), the former Sheriff of Allegheny County and then-Supervisor in Pittsburgh's Cold Case Unit, reopened the investigation of the Columbia fire because it was "on his mind" and he believed it was "solvable" based on the information already in the possession of the Pittsburgh Bureau of Police ("PBP").

52. Evans and Smith were assigned as the primary cold case investigators.

53. Evans and Smith reviewed the entire case file from "scratch."

54. Neither Evans nor Smith assigned anyone to reinvestigate the cause of the fire.

55. Neither Evans nor Smith re-evaluated the original arson determination.

56. Evans and Smith knew that an alleged witness named Shane Evans (no relation to Evans) was interviewed several times during the day of the fire on January 17, 1993.

57. According to the original police reports, Shane Evans told police that just prior to the fire he saw a white male exit the courtyard of the Columbia, that he did not know the identity of the white male, and that he did not see his face.

58. Shane Evans stated that he was alone when he saw this unknown white male.

59. Shane Evans provided no other information about the white male that he claimed to have seen, and he had no other information to provide, on January 17, 1993, or anytime thereafter.

60. Notably, Evans and Smith knew that several other witnesses also provided descriptions of a suspicious white male near the Columbia on the night of the fire.

61. Those descriptions were used to create a reliable composite sketch.

62. At least five witnesses subsequently identified the composite sketch as Glenn Spohn ("Spohn"), a former maintenance man at the Columbia who was alleged to have been terminated from his employment for stealing from the owner, August Peluso ("Peluso"), sharing a social security number with Peluso, and having been the victim of an extramarital affair between his wife and Peluso.

63. Because Evans and Smith were so lacking in evidence to solve this cold case, they placed an advertisement in the Pittsburgh Tribune Review with a reward for information on April 10, 2006.

64. According to Evans and Smith, they were contacted by Sandi Evans (the sister of Shane Evans) in response to the reward.

65. Sandi Evans told Evans and Smith that she saw Mr. Carnevale leaving the courtyard of the Columbia just before the fire.

66. After being contacted by Sandi Evans, Evans and Smith changed the information that she provided to them in the following way:

   a. As stated above, Sandi Evans originally told Evans and Smith that she saw Mr. Carnevale leaving the courtyard of the Columbia just before the fire, but Evans and Smith knew that Sandi Evans' claim was false,

   b. So, Evans and Smith contacted Shane Evans and falsely claimed that both Sandi Evans and Shane Evans saw Mr. Carnevale leaving the courtyard of the Columbia just before the fire, and

   c. When Evans and Smith learned that Sandi Evans did not witness anything before, during, or after the fire, they changed their narrative to falsely claim that only Shane Evans saw Mr. Carnevale leaving the courtyard of the Columbia just before the fire.

67. Evans and Smith knew that Shane Evans' statement contradicted his prior statements to law enforcement, which he provided on at least three separate occasions about the identity (or lack thereof) of any suspect on January 17, 1993.

68. Evans and Smith knew that Shane Evans' statement contradicted the composite sketch that matched Spohn, and not Mr. Carnevale.

69. Evans and Smith knew that Sandi Evans and Shane Evans' claims were unreliable.

70. Evans and Smith knew that Shane Evans—for more than 13 years—never previously claimed that he knew the identity of the white male that he alleged to have seen leaving the courtyard of the Columbia on January 17, 1993.

71. The following is the entirety of Shane Evans' statement(s) on January 17, 1993:

SAW W/M SIDE OF BUILDING[.] 6 ft 180-200[.] JACKET GREEN/FATIGUE[.] SANDY BROWN HAIR[.] DID NOT SEE FACE[.] HEARD THUMP, SAW HIM[.] SIDE BUILDING BY CORDAY WAY[.] 30 MIN THEN SAW FIRE FROM HIS BUILDING 402 TIME OF FIRE[.] FIRE COMING FROM ROOF WITH SMOKE, HEARD F/T[.]

72. Evans and Smith knew that Mr. Carnevale never approached Shane Evans with dirt and soot on his person (as Shane Evans apparently claimed at the criminal trial for the first time), only to exclaim without any provocation that "he was at the sandwich shop!" but they nevertheless chose to falsely testify to that fact in the affidavit of probable of cause.

73. Mr. Carnevale was previously interviewed on March 2, 1993.

74. During his interview, Mr. Carnevale readily admitted to stealing social security and other personalized and individualized checks from tenants of the Regal and Columbia, as well as other mailboxes in the neighborhood.

75. Mr. Carnevale stated that he would steal those checks from the mailboxes in the outdoor courtyard area of the apartment buildings, but that he had never been inside either the Regal or the Columbia.

76. Evans and Smith knew that Mr. Carnevale took and passed a polygraph test in connection with the fire in 1993, thereby ruling him out as a criminal suspect.

77. Evans and Smith also knew that Mr. Carnevale had previously provided investigators with his jacket/fatigue for testing, which produced negative results, again ruling him out as a criminal suspect.

78. Evans and Smith ultimately arrested Mr. Carnevale for crimes relating to the fire at the Columbia (including three homicide charges) based solely on the information provided by Sandi and Shane Evans.

79. Significantly, when Mr. Carnevale was arrested and criminally charged for the fire, he was never given a second polygraph, even though Evans was one of five polygraphists within the PBP who was certified to administer the same, and even though Mr. Carnevale repeatedly requested that Evans (and Smith) administer one to him.

80. Evans and Smith knowingly included at least the following materially false information into the affidavit of probable cause used to arrest Mr. Carnevale that was attributed to Shane Evans:

    a. That Shane Evans saw Mr. Carnevale leaving the courtyard of the Columbia prior to the fire,

    b. That Mr. Carnevale randomly approached Shane Evans while watching the fire only to exclaim that "he was at the sandwich shop!" and

    c. That Mr. Carnevale "fled" to California after the fire.

81. Evans and Smith also knowingly included at least the following other materially false information into the affidavit of probable cause used to arrest Mr. Carnevale:

    a. That the origin of the fire was in the basement of the Columbia in the "Mechanical Room,"

    b. That the "cause of the fire was determined to be person or persons unknown spilled, splashed and or poured some type of flammable liquid in the Mechanical Room and ignited the same with unknown open flame such as a match and or cigarette lighter," and

  c. That the "fire is determined to be incendiary in nature and all accidental and natural causes ruled out."

82. Evans and Smith omitted at least the following material information from the affidavit of probable cause used to arrest Mr. Carnevale:

  a. That the cause of the fire was accidental,

  b. That no physical evidence (including fingerprints or DNA) tied and/or linked Mr. Carnevale to the fire,

  c. That Mr. Carnevale took and passed a polygraph test,

  d. That the jacket worn by Mr. Carnevale on the night of the fire was voluntarily provided for testing, and that it was negative for any chemicals relating to the fire and/or any accelerant that could have been used in the fire,

  e. That, immediately following the fire, Shane Evans told several investigators that he did not see the face of the person that he witnessed leaving the courtyard of the Columbia prior to the fire,

  f. That, at the time of the fire, Shane Evans had known Mr. Carnevale for nearly his entire life and would have recognized him if it had been Mr. Carnevale leaving the courtyard on the night of the fire,

  g. That Sandi Evans was the person who allegedly called Evans and Smith with information, stating that she saw Mr. Carnevale leaving the courtyard of the Columbia on the night of the fire,

  h. That Sandi Evans was not present at the Columbia before, during, or after the fire,

  i. That Sandi Evans was not with Shane Evans on the night of the fire,

  j. That Sandi Evans never saw Mr. Carnevale on the night of the fire,

  k. That Mr. Carnevale provided an alibi as to his whereabouts on the night of the fire,

  l. That Shane Evans neither spoke with nor saw Mr. Carnevale on the night of the fire,

  m. That several witnesses identified Spohn as a suspicious person on the night of the fire and in the week(s) leading up to the fire,

      n.      That a composite sketch of a suspected arsonist was positively identified as Spohn by at least five witnesses, and

      o.      That the ATF had a reliable informant with information on the fire at the Columbia being committed by a contract arsonist (i.e., not Mr. Carnevale).

### *Additional Investigatory Efforts Prior to the Criminal Trial (2006-2007)*

83. DiGiovanni was the district attorney assigned to prosecute Mr. Carnevale.

84. When Evans and Smith initiated the criminal charges against Mr. Carnevale, the only evidence they had to rely upon was that the fire was intentionally set (which, as discussed *supra*, was knowingly false), and that Shane Evans (and Sandi Evans) provided inconsistent, contradictory, and unreliable statements that he (or they) saw Mr. Carnevale on the night of the fire, which were further contradicted by the composite sketch of Spohn.

85. Because the evidence was so lacking against Mr. Carnevale, after remaining in pretrial detention for only three months for crimes he did not commit, DiGiovanni offered him a plea deal for three to 10 years.

86. At the time, Mr. Carnevale was facing consecutive life sentences without the possibility of parole for three counts of second-degree homicide, but he rejected the plea offer as he continued to proclaim his innocence.

87. The following week, DiGiovanni offered Mr. Carnevale a plea deal for two and a half to five years, which he again rejected because of his innocence.

88. In response to the second plea rejection, DiGiovanni deliberately chose to generate false evidence against Mr. Carnevale in support of a prosecution even though she knew that he did not commit any arson at the Columbia.

89. DiGiovanni thus encouraged Evans and Smith to solicit false statements from a jailhouse informant, Sean Burns ("Burns"), who she had used several times in the past to similarly falsify statements against criminal defendants when her case was either weak and/or the criminal defendant was innocent of the crime(s) being charged.

90. DiGiovanni, Evans, and Smith personally met with Burns on several occasions and provided him with the facts that they needed him to testify to support the prosecution of Mr. Carnevale.

91. DiGiovanni, Evans, and Smith provided Burns with information from Mr. Carnevale's prosecution so that he could familiarize himself with the case file and the facts.

92. DiGiovanni, Evans, and Smith also encouraged Burns to get close to Mr. Carnevale so that they could find other ways to falsify information and evidence against him.

93. Ultimately, DiGiovanni, Evans, and Smith directed Burns to fabricate the following testimony against Mr. Carnevale during his criminal trial:

   a. That Mr. Carnevale's motive for setting fire to the Columbia was because he had apparently learned that surveillance equipment might be in the basement,

   b. That Mr. Carnevale did not find any surveillance equipment in the basement of the Columbia, yet he chose to burn down the entire building just in case,

   c. That prior to setting fire to the Columbia, Mr. Carnevale went into the basement office and stole blank business checks,

   d. That within the Regal (and not the Columbia) Mr. Carnevale found a random can of lacquer thinner and instead of pouring it in the office area where the surveillance equipment was alleged to have been located, he decided to pour it in the maintenance room where there was no surveillance equipment,

   e. That Mr. Carnevale ignited the lacquer thinner and left the building with the can to get rid of it,

      f.      That Mr. Carnevale decided to "stash the checks in a bush" (i.e., the blank business checks) for safekeeping, and

      g.      That, sometime in 2006 or 2007, Mr. Carnevale called his wife on a recorded line from the Allegheny County Jail and admitted to the arson.

94. DiGiovanni, Evans, and Smith knew that the entirety of Burns' testimony was false.

95. The alleged recorded phone call between Mr. Carnevale and his wife is destroyed.

96. In exchange for his falsified testimony, DiGiovanni, Evans, and Smith promised (and granted) significant leniency on two pending criminal charges for violations of the Uniform Firearms Act, a fact which DiGiovanni concealed from the criminal jury and the defense.

97. The deal provided to Burns by DiGiovanni, Evans, and Smith was contingent on him providing the exact falsified testimony that they required of him at the criminal trial against Mr. Carnevale.

### *Exoneration of Mr. Carnevale*

98. On August 30, 2007, Mr. Carnevale was convicted of one count of arson and endangering persons, three counts of murder in the second degree, one count of burglary in the first degree, and one count of aggravated assault.

99. Mr. Carnevale was sentenced to three life sentences without parole, one term of seven to fourteen years, one term of six to twelve years, and one term of seven to fourteen years, all to be served consecutively.

100. After spending 13 years in prison for crimes he did not commit, and without any prior possibility of parole or dying anywhere but while incarcerated, Mr. Carnevale was exonerated on March 17, 2020.

## COUNT I

### Violation of the Fourth Amendment for Malicious Prosecution Pursuant to 42 U.S.C. § 1983

**(As to all Defendants)**

101.   The foregoing paragraphs are incorporated herein by reference.

102.   As a direct result of the conduct described herein, Defendants violated Mr. Carnevale's right to be free from malicious prosecution under the Fourth Amendment of the United States Constitution by initiating criminal proceedings against him without probable cause.

## COUNT II

### Violation of the Fourteenth Amendment for Fabrication of Evidence Pursuant to 42 U.S.C. § 1983

**(As to all Defendants)**

103.   The foregoing paragraphs are incorporated herein by reference.

104.   Mr. Carnevale was convicted of various criminal charges—causing him to be sentenced to at least a triple consecutive life sentence—because Defendants fabricated evidence against him and used that fabricated evidence to bring about his prosecution and/or to help secure his conviction.

## COUNT III

### Civil Conspiracy Pursuant to 42 U.S.C. § 1983

**(As to all Defendants)**

105.   The foregoing paragraphs are incorporated herein by reference.

106. Defendants had an explicit agreement to violate Mr. Carnevale's constitutional rights under both the Fourth Amendment of the United States Constitution—namely, to be free from prosecution but upon probable cause—and the Fourteenth Amendment of the United State Constitution—namely, to receive due process of law.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Carnevale requests that this Court grant the following relief:

a. Special damages for lost wages and income, as well as loss of future wages and income,

b. Compensatory damages for emotional and mental harm including fear, humiliation, and mental anguish, as well as future emotional and mental harm for the same, and the value of each day of confinement,

c. Punitive damages in an amount to be determined at trial,

d. Attorney's fees and costs, and

e. All other relief this Court deems just and proper.

Respectfully submitted,

O'BRIEN COLEMAN & WRIGHT, LLC

/s/ Alec B. Wright
Alec B. Wright
Pa. ID No. 316657

Henry W. Oliver Building
535 Smithfield Street, Suite 1025
Pittsburgh, PA 15222
(412) 232-4400

*Counsel for Plaintiff*