**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

DANIEL CARNEVALE,

    Plaintiff

    v.

JENNIFER DIGIOVANNI, SCOTT
EVANS, and J.R. SMITH,

    Defendants.

)
)
)
)
)
)
)
)
)
)

Civil Action No. 2:22-cv-341
Magistrate Judge Patricia L. Dodge

## OPINION[1]

Pending before the Court is Defendant Jennifer DiGiovanni's Motion to Dismiss (ECF No. 10) the Complaint (ECF No. 1) filed by Plaintiff Daniel Carnevale. For the reasons that follow, the Motion will be granted in part and denied in part.

I.     **Background**

In February 2022, Plaintiff Daniel Carnevale commenced this action against Allegheny County Deputy District Attorney Jennifer DiGiovanni as well as Scott Evans and J.R. Smith, both of whom are Detectives with the City of Pittsburgh's Bureau of Police ("PBP"). In his three-count Complaint, Carnevale asserts civil rights claims pursuant to 42 U.S.C. §1983 for violations of the Fourteenth Amendment to the United States Constitution. These claims include Malicious Prosecution (Count I), Fabrication of Evidence (Count II) and Civil Conspiracy (Count III). (ECF No. 1.)

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case. Therefore, the undersigned has the authority to decide dispositive motions and enter final judgment.

Carnevale's allegations relate to a 1993 apartment fire that resulted in the death of three residents and serious injuries to another resident. (*Id.*)  Carnevale alleges improprieties in the initial investigation in 1993, the reopening of an investigation in 2005, and prosecution of the case. (*See generally, id.*) Ultimately, Carnevale was arrested and convicted of one count of arson and endangering persons, three counts of murder in the second degree, one count of burglary in the first degree, and one count of aggravated assault. (*Id.* ¶ 98.) Carnevale was sentenced to three life sentences without parole, one term of seven to fourteen years, one term of six to twelve years, and one term of seven to fourteen years, all to be served consecutively. (*Id.* ¶ 99.) Carnevale alleges that he did not commit the crimes for which he was convicted and that he was ultimately exonerated on March 17, 2020 after spending 13 years in prison.[2] (*Id.* ¶ 100.)

On May 13, 2022, Defendant DiGiovanni moved to dismiss the Complaint. (ECF No. 10.) Defendant Evans and Smith answered the Complaint on June 16, 2022. (ECF No. 22.)  In response to Defendant DiGiovanni's Motion, Carnevale stipulated to the dismissal of Count I – Malicious Prosecution against Defendant DiGiovanni. (ECF No. 23 at 7 n.4.)

## II.    Relevant Factual Allegations

According to the Complaint, on January 17, 1993, a deadly fire occurred at two adjoining apartments in Pittsburgh resulting in the deaths of three residents and serious injuries to another. (ECF No. 1 ¶¶ 9, 11–19.)  Carnevale alleges that based on the witness interviews at the time, the fire was accidental. (*Id.* ¶¶ 10, 20–22.) Carnevale alleges various deficiencies in both the initial investigation of the fire as well as Detectives Evans and Smith's investigation when the case was

---

[2] DiGiovanni contends that Carnevale was not exonerated.  Rather, his sentence was vacated and he was granted a new trial, which was later nolle prossed. (ECF No. 11 at 2 (citing ECF Nos. 10-1 & 10-2)). This distinction is not relevant for purposes of the pending motion.

reopened in 2005. (*Id.* ¶¶ 23–82.) While the details are not required to resolve the pending motion, the allegations, when taken as true, point to various investigative and evidentiary shortcomings leading up to Carnevale's arrest and ultimate conviction.

DiGiovanni was assigned to prosecute Carnevale and offered him two plea agreements: one for three to ten years, and after Carnevale rejected the first plea agreement, she offered a second for two and half to five years, which he also rejected. (*Id.* ¶¶ 83–87.) Following the rejection of the second plea agreement, Carnevale alleges that DiGiovanni deliberately chose to generate false evidence to support her case, even though she knew he did not commit arson. (*Id.* ¶ 88.) Carnevale alleges that DiGiovanni "encouraged Evans and Smith to solicit false statements from a jail house informant," "who she had used several times in the past to similarly falsify statements against criminal defendants when her case was either weak and/or the criminal defendant was innocent of the crime(s) being charged." (*Id.* ¶ 89.)

Carnevale alleges that DiGiovanni, Evans, and Smith met several times with Sean Burns ("Burns"), a jailhouse informant, provided him with case information about which they needed him to testify, and encouraged Burns "to get close to" Carnevale. (*Id.* ¶¶ 90–92.) Ultimately, Carnevale alleges that Defendants knowingly directed Burns to falsely testify at trial in exchange for leniency on other pending charge. (*Id.* ¶ 93–97.)

Pending before the Court is DiGiovanni's fully briefed Motion to Dismiss that seeks her dismissal from this case. (ECF No. 10; ECF No. 23.)

### III.  Standard of Review

To survive a motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Though 'detailed factual allegations' are not required, a complaint must do more than simply provide 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 241 (3d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555). In sum, the plaintiff "must plead facts sufficient to show that her claim has substantive plausibility." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10 (2014). The court's plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

### IV.  Discussion

Because Carnevale stipulates to the dismissal of Count I – Malicious Prosecution against DiGiovanni (ECF No. 23 at 7 n.4), the Court will analyze whether the affirmative defense of absolute immunity bars Count II – Fabrication of Evidence and Count III – Civil Conspiracy against DiGiovanni.

"While the Supreme Court has extended the defense of absolute immunity to certain prosecutorial functions, it has not blanketed 'the actions of a prosecutor ... merely because they are performed by a prosecutor.'" *Fogle v. Sokol*, 957 F.3d 148, 159 (3d Cir. 2020) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993)). "Instead, courts must 'focus upon the functional nature of the activities rather than [the prosecutor's] status' to determine whether absolute immunity is

warranted." *Id. (*quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)). "Applying this functional approach, the Supreme Court has 'emphasized that the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question'" *Id.* (quoting *Burns v. Reed*, 500 U.S. 478, 486 (1991)).

As the Court of Appeals recently explained in *Fogle*:

That functional test separates advocacy from everything else, entitling a prosecutor to absolute immunity only for work "intimately associated with the judicial phase of the criminal process." *Id.* (quoting *Imbler*, 424 U.S. at 430). In that regard, the Court has found, for instance, that prosecutors are immune from claims arising from their conduct in beginning a prosecution, *Imbler*, 424 U.S. at 431, including "soliciting false testimony from witnesses in grand jury proceedings and probable cause hearings," *Kulwicki v. Dawson*, 969 F.2d 1454, 1465 (3d Cir. 1992), presenting a state's case at trial, *Imbler*, 424 U.S. at 431, and appearing before a judge to present evidence, *Burns*, 500 U.S. at 491-92. *See also Van de Kamp* [*v. Goldstein*, 555 U.S. 335, 344 (2009)] (finding prosecutors absolutely immune from claims arising from conduct "directly connected with the conduct of a trial" that "necessarily require[d] legal knowledge and the exercise of related discretion").

By contrast, a prosecutor's "investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." *Buckley*, 509 U.S. at 273. Determining the precise function that a prosecutor is performing is a fact-specific analysis. For instance, "[a] prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Id.* at 274. Before probable cause for an arrest, a prosecutor's "mission at that time [i]s entirely investigative in character." *Id.* "Of course, a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards. Even after that determination, ... a prosecutor may engage in 'police investigative work' that is entitled to only qualified immunity." *Id.* at 274 n.5. It follows that when prosecutors function as investigators, rather than advocates, they enjoy no right to absolute immunity. *Id.* at 275-76; *see also Burns* [*v. Reed*, 500 U.S. 478, 495] (observing that absolute immunity is not so "expansive" as to protect all "direct participation in purely investigative activity"); *Kalina* [*v. Fletcher*, 522 U.S. 118, 129-31 (1997)] (declining to extend absolute immunity where a prosecutor makes a false statement of fact in an affidavit supporting an arrest warrant).

*Id.* at 159–60.

At the motion to dismiss phase, DiGiovanni must demonstrate "that absolute immunity should attach to each act [s]he allegedly committed that gave rise to a cause of action." *Id.* at 160

(quoting *Light v. Haws*, 472 F.3d 74, 80-81 (3d Cir. 2007)). The alleged conduct triggering absolute immunity must "clearly appear[] on the face of the complaint." *Id.* at 160 (quoting *Wilson v. Rackmill*, 878 F.2d 772, 776 (3d Cir. 1989)). In performing this analysis, the Court defines each act to determine whether it was prosecutorial or investigative in nature. *Weimer v. Cty. of Fayette*, 972 F.3d 177, 188 (3d Cir. 2020).

DiGiovanni contends that "[o]nce a criminal complaint is filed and a prosecution is undertaken, absolute prosecutorial immunity broadly attaches to a prosecutor's decision-making process…." (ECF No. 11 at 7.) However, this broad assertion ignores the Third Circuit's instruction to undertake a fact-specific analysis to determine whether each discrete act was prosecutorial or investigative. *Fogle*, 957 F.3d at 164. ("Our role is not to look at the 'timing of the prosecutor's action (*e.g.* pre-or postindictment),' but at the function being performed." (citing *Odd v. Malone*, 538 F.3d 202, 210 (3d Cir. 2008)).

DiGiovanni's briefing identifies certain discrete acts which can be summarized into the following categories:[3]

1. "Generat[ing] false evidence" against Plaintiff "in support of the prosecution," by:

    a. encouraging "Evans and Smith to solicit false statements from a jailhouse informant" who DiGiovanni allegedly "used several times in the past to similarly falsify statements"; and

    b. meeting (along with Evans and Smith) with Burns to provide him with the facts of the case and instructions "to get close to" Carnevale, (ECF No. 1 ¶¶ 90–92);

---

[3] Although DiGiovanni identifies six separate acts (ECF No. 11 at 4–5), in the Court's view, several of the identified act either overlap or are vague or generic. As such, the Court will proceed with its analysis based on the above delineation.

2. Promising Burns leniency regarding two criminal charges pending in exchange for his testimony against Carnevale without disclosing the promise to Carnevale (*Id.* ¶¶ 96–97); and

3. Directing Burns to fabricate testimony at trial and then presenting testimony from Burns at trial, including that "sometime in 2006 or 2007, [Carnevale] called his wife on a recorded line from the Allegheny County Jail and admitted to the arson." (*Id.* ¶¶ 93–95.)

(ECF No. 11 at 4–5.)

The Court first turns to the first two discrete acts, *i.e.*, DiGiovanni's "encouragement" to the detectives to solicit false statements from Burns and Defendants' meeting with Burns to provide him with the facts of the case and instructions to "get close" to Carnevale.

DiGiovanni contends that after exhausting plea agreements, she met with Burns "for the purposes of evaluating what relevant information Burns had or was able to obtain in order to determine whether to present Burns as a Commonwealth witness." (ECF No. 11 at 9.) Thus, DiGiovanni characterizes these as "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of [her] role as an advocate for the State, are quasi-judicial acts entitling the prosecutor to the protections of absolute immunity." *Id.* at 8 (citing *Buckley*, 509 U.S. at 273). Carnevale counters that DiGiovanni was aware of the weakness of her case following the failed plea agreement discussions. (ECF No. 23 at 10–12.) He contends that as a result, DiGiovanni was not acting in a quasi-judicial capacity, but an investigatory capacity by looking for clues and corroborating evidence through soliciting Burns,

7

on whom she had previously relied "when her case was either weak and/or the criminal defendant was innocent of the crime(s) being charged." (*Id.*; ECF No. 1 ¶ 89.)

The facts in the Complaint are similar to those in *Fogle v. Sokol*, in which the Third Circuit rejected prosecutors' claims of absolute immunity at the motion to dismiss stage. 957 F.3d 148, 163–64 (3d Cir. 2020). In *Fogle*, the plaintiff alleged that prosecutors "not only solicited false statements from jailhouse informants, but deliberately encouraged the State Troopers to do the same '[k]nowing their evidence was weak…'" "[t]hus, the [p]rosecutors were functioning not as advocates, but as investigators seeking to generate evidence in support of a prosecution." *Id.* The Third Circuit distinguished these allegations from those allegations in *Yarris*, where the Third Circuit found that general allegations that assistant district attorneys "obtain[ed] a false statement from a jailhouse informant" after plaintiff's prosecution had begun, entitled prosecutors to absolute immunity to such claim. 465 F.3d at 139. In *Fogle,* the Third Circuit rejected the defendants' attempt to rely on *Yarris* to draw "a bright line extending absolute immunity to all conduct surrounding informants after the filing of charges" and reaffirmed that "'a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards,' because '[w]hen the functions of prosecutors and detectives are the same, …the immunity that protects them is also the same.'" 957 F.3d at 164 (citing *Buckley*, 509 U.S. at 274 n.5, 276).

Here, the Complaint alleges that after Carnevale was arrested, DiGiovanni generated false evidence by encouraging detectives to solicit false statements from Burns (who is alleged to have provided false statements in other cases) and meeting along with the detectives with Burns to give him case information and instructions for further actions. (ECF No. 1 ¶¶ 88–92.) Accepting these

8

facts alleged as true and drawing all inferences in favor of Carnevale, the allegations in the Complaint are more akin to those in *Fogle* than the general allegations in *Yarris*. Thus, DiGiovanni has not met her burden to show that she is entitled to absolute immunity for this alleged conduct at this stage of the proceedings.

Next, turning to Carnevale's allegation that DiGiovanni promised Burns leniency in exchange for his testimony and did not disclose such agreement to Carnevale, the Court finds that DiGiovanni is entitled to absolute immunity for a claim based on this conduct. "It is well settled that prosecutors are entitled to absolute immunity from claims based on their failure to disclose exculpatory evidence, so long as they did so while functioning in their prosecutorial capacity." *Yarris v. Cty. of Del.*, 465 F.3d 129, 137 (3d Cir. 2006) (citing *Imbler v*, 424 U.S. at 431–32, n.34 ("the 'deliberate withholding of exculpatory information' is included within the 'legitimate exercise of prosecutorial discretion.'")).

Finally, with respect to DiGiovanni's alleged role of directing Burns to fabricate testimony at trial including specific false statements, DiGiovanni is entitled to absolute immunity for this alleged conduct. "[A] prosecutor is absolutely immune from liability for using 'false testimony in connection with [a] prosecution.'" *Yarris*, 465 F.3d at 139.

**V.    Conclusion**

For these reasons, Carnevale's claim of Malicious Prosecution against Defendant DiGiovanni in Count I will be dismissed with prejudice. The Court will also dismiss with prejudice those portions of Count II and Count III against Defendant DiGiovanni that are based on (1) DiGiovanni's alleged promise of lenience for Burns in exchange for his testimony and the failure

to disclose such information to Carnevale and (2) DiGiovanni's alleged role of directing Burns to fabricate testimony at trial including the alleged false testimony that was elicited.

An appropriate Order follows.

Dated: September 21, 2022                    BY THE COURT:


                                             /s/ Patricia L. Dodge
                                             PATRICIA L. DODGE
                                             UNITED STATES MAGISTRATE JUDGE