## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DANIEL CARNEVALE, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:22-cv-341 |
| | ) | |
| v. | ) | Magistrate Judge Patricia L. Dodge |
| | ) | |
| JENNIFER DIGIOVANNI, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Jennifer DiGiovanni ("DiGiovanni") filed the present Motion in Limine (ECF No. 87) seeking to exclude the expert report and testimony of Jonathan L. Meyer ("Meyer"). Meyer, who has been retained by Plaintiff Daniel Carnevale ("Carnevale"), has offered certain expert opinions regarding prosecutorial standards and DiGiovanni's alleged failure to meet them.

DiGiovanni's motion has been fully briefed (ECF Nos. 88, 97, 99) and is now ready for disposition. For the reasons that follow, the motion will be granted.

### I.    Relevant Background

Carnevale commenced this action in 2022 against DiGiovanni, Scott Evans and J.R. Smith ("Defendants Evans and Smith") relating to Carnevale's prosecution for a crime that he did not commit. The original Complaint asserted Fourteenth Amendment claims of malicious prosecution, fabrication of evidence and civil conspiracy against DiGiovanni. In response to DiGiovanni filing a motion to dismiss all claims against her, the Court dismissed Carnevale's claim of malicious prosecution with prejudice. Additionally, his claims of fabrication of evidence in violation of the Fourteenth Amendment and civil conspiracy under Section 1983 were dismissed with prejudice to the extent that the claims were based on (1) DiGiovanni's alleged promise of lenience for witness Sean Burns ("Burns") in exchange for his testimony and the failure to disclose such information

to Carnevale; and (2) DiGiovanni's alleged role of directing Burns to fabricate testimony at trial, including the alleged false testimony that was elicited.

Carnevale subsequently filed an Amended Complaint (ECF No. 44) which, among other things, reasserted fabrication of evidence and civil conspiracy claims against DiGiovanni. The remaining claims against DiGiovanni are that she: (1) generated false evidence and used that fabricated evidence to bring about Carnevale's prosecution and/or conviction "in that she encouraged [Defendants] Evans and Smith to solicit false statements from a jailhouse informant who she used several times in the past to similarly falsify statements and by meeting (along with Evans and Smith) with Burns to provide him with facts of the case and instructions to get close to Mr. Carnevale"[1] (Count II); and (2) engaged in a conspiracy with Defendants Evans and Smith to generate false evidence and then used that false evidence to bring about Carnevale's prosecution and conviction (Count III).

## II.    Summary of Relevant Portions of Meyer's Expert Report

Carnevale submitted the expert report of Meyer in support of his claims against all of the Defendants. Meyer states that the testimony of Burns, a jailhouse informant, played a prominent role in Carnevale's conviction. Burns, who was housed in the same part of the jail as Carnevale, provided a taped statement to law enforcement and DiGiovanni. Among other things, Burns claimed that Carnevale confessed to setting the fire for which he was later wrongfully convicted.

As it relates to the conduct of DiGiovanni, Meyer opines about various instances of what he has characterized as her improper prosecutorial conduct. He asserts that it was not reasonable for DiGiovanni to rely on information provided by alleged witness Shane Evans[2] as a basis to find

---

[1]  (ECF No. 44 ¶ 107.)
[2]  Throughout his Brief, Carnevale challenges the veracity of conflicting statements and testimony provided by Shane Evans in the underlying criminal case. (*See* ECF No. 97.)

probable cause or to present that information at trial when there was reason to question the accuracy or truthfulness of the information. Meyer further asserts that despite her obligation to ensure that the information provided by Shane Evans was dependable and reliable, she failed to do so. According to Meyer, despite there being no proof that DiGiovanni knew that Shane Evans possessed conflicting information, "she was more intent in convicting someone than actually uncovering the truth of what happened."[3] (ECF No. 98-1 at 297).

Meyer also opines that the use of Burns as a witness may have been more troubling than the use of Shane Evans' information. He notes that there were "warning signs of trouble" that were ignored, including Burns' use of an alias and his prior criminal history. (*Id.* at 298.) Based on these warning signs, all information provided by Burns should have been verified by DiGiovanni, but was not, even though the scenario Burns recounted "does not appear to be reliable." (*Id.* at 304.)

Meyer further states his opinion that Burns was an "incentivized witness." (*Id.* at 300.) He notes that a letter Burns sent to DiGiovanni that is postmarked after Burns had provided his testimony references a meeting the week before. Based solely on his own belief that it would not have made sense to meet after Burns' testimony, Meyer concludes that DiGiovanni likely met with Burns before he testified at trial and promised him a reduced sentence. Meyer asserts that DiGiovanni violated her ethical obligations and duties as a prosecutor by failing to disclose this information and information about Burns' background to Carnevale's defense counsel. According to Meyer, this prevented Burns from being "fully cross-examined." *Id.*

Meyer also opines that :

Best practice dictates that, when an informant is involved, all dealings be done in writing. Although Mr. Burns claimed in his testimony and statement no promises

---

[3]  Carnevale's Brief similarly alleges that DiGiovanni was "pursuing the criminal conviction of Mr. Carnevale in the face of conflicting statements from Shane Evans over a 13-year period[.]" (ECF No. 97 at 2.)

had been made, best practices would dictate that Ms. DiGiovanni would have created a contract detailing all aspects of what was to occur and the steps that would be taken to ensure the truthfulness of the information provided. For instance, it would not be uncommon nor unreasonable to require a polygraph examination to ensure the truthfulness of the information provided. No such assurances were made here. Given the lack of quality control measures taken by law enforcement and Ms. DiGiovanni as to the information provided by Mr. Burns, it was vital that the information provided be verified through further investigation. There appears to have been no attempt to prove or disprove the information provided by Mr. Burns. The problems involved in the information are many of the same problems with Mr. Evans' information that was here- [sic] lack of due diligence on behalf of law enforcement and Ms. DiGiovanni. Based on the undisclosed information concerning the relationship between Ms. DiGiovanni and Mr. Burns, and the lack of information as to how many times they met or what was discussed, it is also reasonable to infer that something much more nefarious was occurring, such as Ms. DiGiovanni providing criminal investigatory information to Mr. Burns and against Mr. Carnevale.

(ECF No. 98-1 at 301.)[4]

## III.  <u>Legal Standard</u>

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which

provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

---

[4] This summary is not intended as an exhaustive review of Meyer's report and opinions. Meyer critiques the nature of DiGiovanni's investigation in multiple respects and renders opinions about her conduct and failure to disclose evidence. (*See* ECF No. 88 at 3-5.)

Under Rule 702, trial courts are to act as "gatekeeper" and exercise discretion to preclude expert testimony that is unreliable, irrelevant, or unhelpful to the jury. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993). In the Third Circuit, district courts must focus on the "trilogy of restrictions on expert testimony: qualification, reliability and fit." *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316 (3d Cir. 2003). A district court should therefore permit expert testimony so long as (1) the expert has the necessary qualifications, (2) the testimony is based on scientifically valid methods, and (3) the testimony would assist the trier of fact in understanding the evidence or in resolving factual issues. *See In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 741-43 (3d Cir. 1994).

**IV.    The Parties' Positions**

    A.  DiGiovanni's Arguments

        a.  Fit

In moving to exclude Meyer as an expert, DiGiovanni first contends that Meyer's opinions do not fit the remaining issues in this case because at least some of his proffered opinions relate to claims against her that have been dismissed. Specifically, she notes that Meyer: (1) opines that she failed to conduct the necessary investigations; (2) critiques her conduct during the prosecution of Carnevale; (3) reviews her conduct regarding the use of Shane Evans and Burns in the prosecution; (4) attacks her investigation in multiple respects; (5) opines on her failure to disclose evidence, leading to the conclusion that Burns was an incentivized witness; (6) relies on standards not applicable to this case, which relate to intentional conduct; and (7) concludes that Burns' statement and trial testimony were unreliable and implausible. DiGiovanni maintains that none of these conclusions relate to the only remaining issues in this case—whether she generated false evidence by encouraging and/or conspiring to solicit false statements from Burns, and meeting with Burns,

along with Defendants Evans and Smith, in order to give Burns case information and instructions for further actions.

Thus, DiGiovanni argues that because Meyer's opinions and conclusions do not relate to any remaining issues regarding her potential liability, and therefore would not be helpful to the jury, the fit requirement has not been satisfied.

b.  Reliability

DiGiovanni argues that Meyer's opinions which do relate to remaining issues are based solely on his faulty assumptions and speculation. As it relates to Shane Evans, DiGiovanni asserts that the report mischaracterizes his statements and testimony about what he saw and heard. Meyer then relies on his own mischaracterizations rather than the statements and testimony itself to form his opinions. As such, DiGiovanni states that Meyer lacks any factual support for his conclusion that Shane Evans' statements must have come from unidentified investigators or prosecutors. Meyer reaches a similar conclusion about the information supplied by Burns. Thus, DiGiovanni contends that without any factual support, Meyer's assumptions neither fit the facts of the case nor are they reliable.

DiGiovanni also asserts that Meyer is merely speculating that she may have given Burns investigatory information. By way of example, she cites Meyer's inference that because her interview with Burns was not recorded, DiGiovanni could have given Burns information, either directly or indirectly, by the way she framed her questions to him. In arguing for the exclusion of these opinions, DiGiovanni contends that an expert's opinions are properly excluded when they are based upon nothing more than speculation and conjecture. (ECF No. 88 at 8.)

c.   Confusion/Prejudice

Finally, DiGiovanni argues that Meyer's opinions will only confuse the jury because it would require them to determine whether she negligently performed her prosecutorial functions, violated her professional responsibilities, failed to conduct a reasonable investigation and/or failed to follow best practices or reasonable prosecutorial standards. According to DiGiovanni, all of these matters are irrelevant to Carnevale's remaining claims against her—that the Defendants engaged in a conspiracy to intentionally fabricate evidence in order to prosecute Carnevale. Thus, allowing Meyer to render opinions on DiGiovanni's prosecutorial performance would be unduly prejudicial to her. Likewise, allowing him to speculate about what she may have done or failed to do, or her state of mind, is both improper and highly prejudicial.

B.   Carnevale's Response

Carnevale's Brief in Opposition (ECF No. 97) to DiGiovanni's motion provides a detailed recitation of the underlying facts for the stated purpose of putting Meyer's opinions "into context." He critiques DiGiovanni's recitation of Meyer's opinions without explaining the purpose of these opinions. Carnevale argues that Meyer's testimony is necessary to help the jury understand proper prosecutorial standards in contrast to DiGiovanni's pursuit of a criminal conviction despite Shane Evans' conflicting statements and her surreptitious use of a jailhouse informant in the absence of any physical or circumstantial evidence.

A portion of Carnevale's legal argument focusses on Meyer's qualifications, asserting that he is "more than qualified" to opine on prosecutorial standards. (*Id.* at 21.) As the Court interprets DiGiovanni's motion, however, she is not contending that Meyers is not qualified as an expert.

Carnevale also asserts that Meyer's opinions are grounded in a basic prosecutorial standard. That is, whether they are established by "law, rule, policies or model policies," such standards are

the minimum acceptable standards for a prosecutor. Carnevale argues that Meyer opines on professional standards in multiple respects as it relates to both Shane Evans and Burns. He then indicates that:

> Relevant evidence in proving that DiGiovanni fabricated evidence against Mr. Carnevale to secure a criminal conviction includes her willful ignorance to discrepant statements from Shane Evans. It also includes the clandestine meetings and communications involving DiGiovanni and Sean Burns and their relationship. Meyer provides context to the prosecutorial standards that should have guided or governed DiGiovanni's acts and omissions when confronting a circumstantial case resting only on the discrepant statements of Shane Evans—that is, until Sean Burns surfaced against Mr. Carnevale and others on DiGiovanni's behalf. Meyer provides context as to what a prosecutor is supposed to do in a cold case like this one, and then applies his experience to what DiGiovanni actually did, in rendering his opinion. Whether DiGiovanni broke from prosecutorial norms is a crucial part of the jury's deliberation.

(ECF No. 97 at 23.)

Carnevale also contends that while DiGiovanni may be immune from knowingly presenting perjured evidence at trial, her use of such evidence at trial remains relevant when deciding if she fabricated it from the outset.

Thus, Carnevale concludes, Meyer's testimony fits the facts of this case and is limited to his opinions regarding prosecutorial standards.

### C. DiGiovanni's Reply

In her Reply (ECF No. 99), DiGiovanni notes that many of the facts in Carnevale's Brief and attached exhibits are not mentioned anywhere in Meyer's expert report. She argues that Carnevale cannot salvage Meyer's report by providing facts and exhibits that Meyer did not reference or rely on in preparing his report. DiGiovanni also states that some of the facts supplied by Carnevale in his brief contradict Meyer's recitation of the facts. (*See* ECF No. 99 at 5-6.) DiGiovanni suggests that Carnevale is belatedly attempting to bolster or revise Meyer's expert report because the report fails to support the remaining claims against her.

DiGiovanni further contends that Meyer's report does not cite the source of the prosecutorial standards upon which he claims to rely. Carnevale's Brief similarly fails to establish the origin of these standards. Moreover, she argues that the standards used by Meyer apply to prosecutors, not to DiGiovanni in her capacity as an investigator or administrator.

### V.    <u>**Discussion**</u>

As the Court addressed when it granted in part DiGiovanni's motion to dismiss, DiGiovanni was found absolutely immune with respect to her promise of leniency to Burns in exchange for his testimony and for her failure to disclose that agreement to Carnevale. Similarly, she was also found to be immune from liability with respect to her alleged role of directing Burns to fabricate testimony at trial. (*See* ECF No. 27.)

That leaves Carnevale's Fourteenth Amendment claim in Count II of the Amended Complaint, alleging that DiGiovanni fabricated evidence by encouraging Defendants Evans and Smith to solicit false statements from Burns and by meeting with Burns to provide him case information and instructions for further action. In addition, the claim in Count III alleges a conspiracy between DiGiovanni, Defendant Evans and Defendant Smith to commit the acts alleged in Count II.

It is undisputed that DiGiovanni was not involved in the original investigation of the fire and became involved only after Carnevale was arrested. Meyer's expert report nonetheless reviews at length the role of Shane Evans in the fire investigation beginning in 1993. While Meyer's report discusses the use of Shane Evans in the prosecution as improper conduct by DiGiovanni, Meyer's opinions on this subject are irrelevant because there are no remaining claims in this case against DiGiovanni that relate to Shane Evans. Moreover, as Meyer acknowledges, there is no evidence that DiGiovanni knew of Shane Evans' conflicting witness statements or that was she involved in

submitting the affidavit of probable cause to the court that lead to Carnevale's arrest. At any rate, while Meyer's opinion that DiGiovanni failed to further investigate Shane Evans' role and statements once she became involved provides some support for a conclusion that her investigation was incomplete or faulty, it fails to support in any way a claim that such conduct is equivalent to the fabrication of evidence.

Turning to Meyer's opinions about Burns, a portion of his report discusses DiGiovanni's alleged misconduct in incentivizing him as a witness. As previously discussed, however, DiGiovanni is immune from liability for promising Burns leniency and then failing to disclose it. Thus, Meyer's opinion that DiGiovanni "violated her ethical obligations and imposed duties by failing to disclose the information to defense counsel," (ECF No. 98-1 at 300), is neither relevant nor would it be helpful to the jury.[5]

Meyer also characterizes the fact that Burns had used an alias and had a previous criminal history as "warning signs." Yet he fails to connect Burns' criminal history to any improper conduct by DiGiovanni or to identify any specific prosecutorial standards that he claims were violated by meeting with, or even relying upon, a witness with a criminal record. Meyer goes on to discuss "best practices," including his conclusion that DiGiovanni's dealings with Burns should have been in writing. He surmises, without any factual support, that something "much more nefarious was occurring, such as Ms. DiGiovanni providing investigatory information to Mr. Burns and against Mr. Carnevale." (ECF No. 98-1 at 301.) While this does appear to go to Carnevale's claim that DiGiovanni met with Burns to give him case information and instructions, it is purely speculative and lacks any factual foundation. Notably, Meyer acknowledges that it is reasonable for a

---

[5] Similarly, Meyer's opinion that DiGiovanni should have disclosed all information about Burns' background, incentives and correspondence to Carnevale's defense counsel is appropriately excluded based on the Court's prior ruling.

prosecutor and law enforcement to meet with a jailhouse informant. And the mere fact that DiGiovanni could have improperly provided information to Burns is neither helpful to the jury, nor does it require expert testimony to reach such a conclusion.

That leaves Carnevale's claims that DiGiovanni generated false evidence by encouraging and conspiring with Defendants Evans and Smith to solicit false statements from Burns. While the report details Meyer's issues with the veracity of Burns' statement and testimony, and opines that more investigation should have been done, at no time does Meyer provide any facts or opinions to support Carnevale's claim that DiGiovanni encouraged Defendants Evans and Smith to solicit false statements from Burns.[6]

Meyer concludes his report by expressing the opinion that law enforcement and DiGiovanni failed to follow best practices and conduct the necessary investigations to ensure the accuracy of information provided to the court and the jury. While his report details the bases for these opinions, these conclusions fail to address or support Carnevale's claims that DiGiovanni fabricated evidence either by encouraging Defendants Evans and Smith to solicit false statements or by meeting with Burns to provide him with facts and information. Rather, Meyer engages in nothing more than speculation about who, if anyone, provided information, false or otherwise, to Burns. Moreover, even assuming that DiGiovanni did not engage in best practices or was negligent in her investigation of Burns' representations, this fails to support Carnevale's claims of deliberate fabrication of evidence to secure a conviction or engaging in a conspiracy to generate and use false

---

[6] Meyer notes that it is unclear how Burns obtained certain information, but states that a reasonable inference could be drawn that it was provided by "someone involved in Mr. Carnevale's arrest and/or prosecution." (ECF No. 98-1 at 293.) He does not opine that it was provided by DiGiovanni or that she encouraged Defendants Evans or Smith to provide this information. It is also notable that DiGiovanni was not involved in the prior investigation or the arrest. Moreover, it does not require an expert to draw a reasonable inference that information was supplied by someone to Burns.

evidence. Simply put, Meyer's opinions neither fit the remaining claims against DiGiovanni, nor are they reliable. Additionally, his opinions would not be helpful to a jury because expert testimony is not required in order for laypersons to conclude whether the facts in this case support Carnevale's claims of intentional misconduct by DiGiovanni.

For these reasons, it is ORDERED that DiGiovanni's Motion in Limine to Exclude Expert Report and Testimony of Expert Witness (ECF No. 87) is GRANTED. As it relates to the liability of Defendant DiGiovanni only, Plaintiff is precluded from offering the testimony and opinions of Jonathan L. Meyer at trial.

Dated: December 11, 2024                    BY THE COURT:


                                            /s/ Patricia L. Dodge
                                            PATRICIA L. DODGE
                                            United States Magistrate Judge