IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DANIEL CARNEVALE, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 2:22-cv-341 |
| ) | |
| v. ) | Magistrate Judge Patricia L. Dodge |
| ) | |
| JENNIFER DIGIOVANNI, SCOTT ) | |
| EVANS, and J.R. SMITH, ) | |
| ) | |
| Defendants. ) | |

### MEMORANDUM OPINION[1]

Plaintiff Daniel Carnevale ("Carnevale") brings this civil action against Jennifer DiGiovanni ("DiGiovanni"), Scott Evans ("Det. Evans"), and J.R. Smith ("Det. Smith") (collectively "Defendants"). Pending before the Court are two motions for summary judgment filed by DiGiovanni (ECF No. 102) and Dets. Evans and Smith (ECF No. 108). For the following reasons, the motions will be granted in part and denied in part.

**I.   Relevant Procedural History**

In 2007, Carnevale was convicted of arson, three counts of murder in the second degree, burglary, and aggravated assault stemming from an apartment fire that occurred in January 1993. (ECF No. 44 ¶ 100.) He was sentenced to life in prison without the possibility of parole. (*Id.* ¶ 101.) Carnevale's conviction was later overturned and the prosecution declined to seek a new trial. He was released from prison on March 17, 2020 after serving thirteen years of his sentence. (*Id.* ¶ 102.)

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case. The undersigned therefore has the authority to decide dispositive motions and enter final judgment.

Carnevale commenced this civil rights action against Defendants in 2022, asserting claims of malicious prosecution, fabrication of evidence, and civil conspiracy.[2] (ECF No. 1.) Dets. Evans and Smith answered the Complaint (ECF No. 22) and DiGiovanni moved to dismiss all claims against her (ECF No. 10).

In response to the motion to dismiss, Carnevale stipulated to the dismissal of the malicious prosecution claim against DiGiovanni. (ECF No. 23 at 7 n.4.) The Court partially granted DiGiovanni's motion, dismissing the fabrication of evidence and § 1983 conspiracy claims against her to the extent the claims were based on: (1) DiGiovanni's alleged promise of lenience for jailhouse informant Sean Burns ("Burns") in exchange for his testimony at trial and the failure to disclose such information to Carnevale; and (2) DiGiovanni's alleged role of directing Burns to fabricate testimony and eliciting his false testimony at trial. (ECF Nos. 27, 28.)

Carnevale amended the complaint to conform with the Court's order.[3] (ECF No. 44.) Count I asserts malicious prosecution against Dets. Evans and Smith only, alleging that Dets. Evans and Smith initiated the criminal proceedings against Carnevale without probable cause in violation of the Fourth Amendment. Carnevale's two other claims are brought against all three Defendants. At Count II, he alleges that Defendants fabricated evidence and used that evidence to bring about his prosecution and conviction. Count III alleges that Defendants engaged in a conspiracy to violate Carnevale's Fourth and Fourteenth Amendment rights. (*Id.* ¶¶ 103-10.)

---

[2] Carnevale later filed an Amended Complaint, but the claims against Defendants remain the same. *See* ECF Nos. 1, 44.
[3] The Amended Complaint also named the United States as a defendant, asserting a claim of malicious prosecution under the FTCA. (ECF No. 44 ¶¶ 111-13.) The United States moved to dismiss and the Court granted the motion on August 17, 2023. (ECF Nos. 71, 72.) The Court denied Carnevale's motion for reconsideration on October 6, 2023. (ECF No. 77.)

After a lengthy discovery period, DiGiovanni moved for summary judgment (ECF No. 102), as did Dets. Evans and Smith (ECF No. 108). The motions have been fully briefed (ECF Nos. 103, 104, 105, 109, 110, 116, 117, 118, 119, 120, 121, 122, 126, 127, 128, 130, 131, 137) and are ready for disposition.

## II. Relevant Factual Background[4]

The Columbia Apartments were located at 220-230 Taylor Street in Pittsburgh's Bloomfield neighborhood. (ECF No. 109 ¶ 1.) They consisted of two structures, each with three stories and a basement, that connected to form an "L" shape. (*Id.* ¶ 5.) The basement included a maintenance room for tools and a small office used by one of the building's owners. (*Id.* ¶¶ 7, 66-67.)

At approximately 4:30 a.m. on January 17, 1993, Pittsburgh Bureau Police ("PBP") and Fire responded to a fire at the Columbia Apartments. (ECF 109 ¶ 2.) The fire consumed the roof of the building and all three floors collapsed into the basement. (ECF No. 130 ¶ 85.) Three residents died in the fire and another was critically injured. (*Id.* ¶ 86.)

### A. Initial Investigation

The City of Pittsburgh Fire Department and local law enforcement initially handled the investigation. (*Id.* ¶ 87.) On January 22, 1993, agents from the Bureau of Alcohol, Tobacco, and Firearms ("ATF") arrived to help determine the cause and origin of the fire. (*Id.* ¶¶ 88-91.) The

---

[4] The history of this case is extensive and complex. The facts in the subsequent sections of this Opinion are drawn from the competing concise statements of material facts and responses thereto. *See* ECF Nos. 103, 109, 117, 119, 127, 130. The parties disagree on a significant number of facts relevant to the disposition of the motions. These disputes are noted throughout. Only those facts relevant to the disposition of the motions will be discussed herein.

ATF concluded that the fire had been intentionally set using an accelerant[5] in the maintenance room located in the basement of the Columbia Apartments. (*Id.* ¶¶ 90-93.)

Police also interviewed several eyewitnesses who described seeing an individual outside the Columbia Apartments immediately before the fire. (*Id.* ¶¶ 114-17.) Police used these witness accounts to develop a composite sketch of someone considered to be a suspicious person in connection with the fire. *See* ECF No. 120-25.

One such witness, Shane Evans, lived near the Columbia Apartments in January 1993. At around 4:45 a.m. on the night of the fire, police records in the historical case file state that Shane Evans approached a PBP officer at the scene to report having seen an individual walking in the alley behind the apartment building shortly before the fire. Shane Evans described the person as a white male, 6'0" tall, 180-200 lbs., sandy brown hair, wearing a green army fatigue jacket. The officer's handwritten note states, "DID NOT SEE FACE[.]" (ECF No. 120-19 at 10.) Shane Evans gave a statement to a second responding officer, again describing "an unk. W.M. 5'10" to 5'11" – 200 lbs. – shoulder length sandy brown hair – wearing an army field jacket." (ECF No. 120-18.) The second officer similarly notes that "Mr. Evans did not see the person's face." (*Id.*) Shane Evans then provided a third statement to a detective on the scene, once again recounting that he had seen a white male, 5'10", 200 lbs., with shoulder length sandy-colored hair in the alley behind the apartment building. (ECF No. 120-19 at 4-5.) The detective's report also expressly notes that "Mr. Evans stated that he did not see the face of the person."[6] (*Id.* at 5.)

---

[5] An initial ATF report states that "lacquer thinner" was used to start the fire. (ECF No. 120-9 at 2.) Later reports identify the accelerant as "mineral spirits." (ECF No. 120-11.)

[6] Dets. Evans and Smith moved to strike several affidavits offered by Carnevale (ECF No. 141), including that of retired PBP arson detective Ronald Rudolph (ECF No. 120-19). They argue that because Mr. Rudolph's affidavit states that he "cannot remember" Carnevale, he lacks the requisite personal knowledge. They ask that the Court strike the affidavit and its attachments, including two of Shane Evans' contemporaneous statements. *See* ECF No. 142. The affidavit states that the

4

Carnevale was interviewed by police on March 2, 1993. (ECF No. 109 ¶ 20.) Police first learned of Carnevale when his roommates reported to PBP that they had found checks from the Columbia Apartments in Carnevale's room. (*Id.* ¶¶ 146-47.) During the interview, Carnevale admitted that he stole checks from mailboxes at the Columbia Apartments on an "almost daily basis."[7] (ECF Nos. 109 ¶ 21, 8; 119 ¶ 8.) The mailboxes were located in the outdoor courtyard of the apartments. Carnevale maintains that "everything he stole was outside the building and denied ever being in the building." (ECF No. 118 ¶¶ 8, 151-53.) PBP did not arrest or charge Carnevale at that time.

At his deposition on February 27, 2024, Carnevale testified that PBP detectives asked to test the jacket that he had been wearing on the night of the fire. (ECF No. 120-2 at 20.) He also testified that he had taken and passed a polygraph test.[8] (*Id.* at 19-24.)

On May 18, 1993, Carnevale contacted PBP and told detectives that he had been arrested in California for stealing a vehicle in Pittsburgh and driving it to California. (ECF No. 130 ¶ 158.) He asked to be extradited to Pittsburgh for charges related to the stolen vehicle. (*Id.* ¶¶ 159-60.) PBP declined to contact or follow-up with Carnevale again during that time period. (*Id.* ¶ 161.)

---

reports were written by PBP investigators contemporaneous to the fire and speaks primarily to the authenticity of the documents rather than to Mr. Rudolph's current recollection of events. As Dets. Evans and Smith do not argue that the statements are not a part of the historic case file or challenge the authenticity of the documents, the Court declines to strike the reports at this time. Any evidence that the parties intend to introduce at trial must, of course, comply with the relevant rules against hearsay, subject to any applicable exceptions.

[7] Carnevale also admitted that he stole Christmas decorations on one occasion. (ECF No. 119 ¶ 10.)

[8] Immediately after his arrest in 2006, Carnevale told his wife that he had previously passed a polygraph test. (ECF No. 121-4 at 7.) Defendants dispute that Carnevale took a polygraph and allege that he fled to California before one could be administered. (ECF No. 130 ¶ 175.)

B. **Cold Case Investigation**

Sometime in 2005, PBP opened a cold case investigation into the Columbia Fire. Dets. Evans and Smith were assigned to the case. (ECF No. 109 ¶ 34.) PBP ran an article in the newspaper discussing the fire and the revived investigation.

In January 2006, PBP was contacted by Sandra Evans regarding the article. (ECF No. 120-38.) Sandra Evans allegedly told PBP that her brother, Shane Evans, had information about the fire.[9] Dets. Evans and Smith interviewed Shane Evans on January 27, 2006. (ECF No. 130 ¶ 191.) During the interview, Shane Evans stated that while walking home on January 17, 1993 at around 4:00 a.m., he observed Carnevale exiting the side/courtyard door of the Columbia Apartments and quickly walking away from the building. Shane Evans did not know that the building was on fire and continued to walk home. A short time later, he heard sirens and went outside where a crowd had gathered. Shane Evans recounted that he noticed Carnevale standing nearby watching the fire. He walked over and stood next to Carnevale. Before he could say anything, Carnevale allegedly said, "I was at the Sandwich Shop." (ECF No. 120-38.)

> A supplemental report regarding Dets. Evans and Smith's interview of Shane Evans states:
>
> Shane stated that at this time he suspected Carnevale of setting the fire and intended on staying with Carnevale until he could notify a fire official of what he had seen. Shane stated that the only fire fighters nearby were the ones fighting the fire, so he [Shane] left the fire scene and walked to Liberty Avenue, where he spoke to a white shirt [fire officer]. Shane stated that he told the white shirt that the person that set the fire is on Taylor Street. Shane states that the white shirt directed him to the police. Shane stated that he went to the police [uniformed] and told them what he had seen. Shane stated that the police only took his name and phone number and said that they would forward his information to the Detectives.
>
> Shane states that days later the Detectives contacted and interviewed him. Shane stated that he explained to the Detectives what he had seen, then viewed a composite sketch. Shane stated that the composite sketch didn't really look like Carnevale even though he [Carnevale] was a tall white male with long hair.

---

[9] Carnevale disputes that Sandra Evans ever contacted PBP. *See* ECF No. 119 ¶ 178.

> Shane stated that he had known Carnevale for years prior to the incident date from living and growing up in the same neighborhood.

(ECF No. 120-39 at 2) (alterations in original).

### C. Carnevale's Arrest

On July 26, 2006, an Affidavit of Probable Cause ("the Affidavit") seeking a warrant for Carnevale's arrest was submitted. *See* ECF No. 121-2. The Affidavit recounts Shane Evans' 2006 interview. (*Id.* at 3.) All other information and evidence set forth in the Affidavit was developed in 1993. The three prior statements that Shane Evans gave to police on the night of the fire are not mentioned. (*Id.* at 2-3.) The Affidavit formed the base of the Criminal Complaint filed against Carnevale on July 26, 2006.[10] *See* ECF No. 109-3.

Carnevale was arrested on August 12, 2006, and subsequently incarcerated at the Allegheny County Jail ("ACJ") to await trial. (ECF No. 109 ¶¶ 4, 43.) While at ACJ, Carnevale met fellow inmate Sean Burns. (*Id.* ¶ 44.) At some point, Burns began having discussions with the District Attorney's Office, Det. Evans, and Det. Smith about testifying against Carnevale. DiGiovanni was the Assistant District Attorney handling Carnevale's case at this time.

On March 1, 2007, Burns participated in an unofficial interview with DiGiovanni, Det. Evans, Det. Smith, and Burns' attorney. Burns stated during the interview that he had become friendly with Carnevale. On December 27, 2006, Burns said he had found Carnevale upset and hysterically crying in his cell because he thought that his wife was going to leave him. According to Burns, Carnevale then admitted to starting the Columbia Apartments fire in an attempt to destroy surveillance equipment that would have shown Carnevale stealing checks from the building's

---

[10] The unsigned copy of the Affidavit dated June 21, 2006 reads "AFFIANT(S): DET.S' J.R. SMITH #3567, S. EVANS #3717." (ECF No. 121-2 at 1.) The Affidavit attached to the Criminal Complaint lists only Det. Smith as the affiant. *See* ECF No. 109-3 at 1.

mailboxes. *See* ECF No. 109-22. Carnevale vehemently denies ever discussing his case with Burns let alone confessing to starting the fire.

Burns wrote to DiGiovanni at least four times. The letters are mostly undated and are marked "INTEROFFICE MAIL." *See* ECF No. 121-17. Burns references testifying against Carnevale several times throughout the letters. One letter also includes legal research materials on corroborating evidence and cross-examination of witnesses at trial. (*Id.* at 3-30.) It is unclear if DiGiovanni ever received the letters or responded to Burns.

Both Burns and Shane Evans testified against Carnevale at trial. Carnevale was ultimately convicted and found guilty on all counts. He has maintained his innocence at all times.

## III. Legal Standard

The Federal Rules of Civil Procedure provide that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In following this directive, a court must take the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler Cty. Fam. YMCA*, 418 F.3d 265, 267 (3d Cir. 2005); *Doe v. Cty. of Centre, Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

## IV. Discussion

Carnevale's three claims are brought under 42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Section 1983 does not itself create any substantive rights; it simply provides a cause of action that allows the plaintiff to vindicate rights that have already been secured. *See, e.g.*, *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002) ("§ 1983 merely provides a mechanism for enforcing individual rights 'secured' elsewhere"). Carnevale's claims allege violations of the Fourth and Fourteenth Amendments. U.S. Const. amend. IV, XIV.

A § 1983 plaintiff also bears the burden of showing that each named defendant was personally involved in the alleged constitutional violation. *See Saisi v. Murray*, 822 Fed. Appx. 47, 48 (3d Cir. 2020). The doctrine of respondeat superior alone cannot be the basis for liability in a § 1983 action. *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)); *see also Iqbal*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to . . . 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

9

A. **Malicious Prosecution**

Carnevale's malicious prosecution claim against Dets. Evans and Smith is premised on the Affidavit of Probable Cause that was the basis to initiate the criminal proceedings. To succeed on a Fourth Amendment malicious prosecution claim, the plaintiff must show: "(1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *Halsey v. Pfeiffer*, 750 F.3d 273, 297 (3d Cir. 2014).

As an initial matter, Dets. Evans and Smith argue that Det. Evans lacks sufficient personal involvement to be found liable as he "did not write, and there is no record evidence that he participated in writing, the affidavit of probable cause supporting the arrest of Mr. Carnevale." (ECF No. 110 at 21.) This argument is unpersuasive. As mentioned above, a copy of the Affidavit dated June 21, 2006 lists both Det. Evans and Det. Smith as affiants. *See* ECF No. 121-2 at 1. The information related to Shane Evans' 2006 interview set forth in both versions is identical. *See* ECF Nos. 109-3 at 6; 121-2 at 1. While it is unclear why the later version omits Det. Evans, as Carnevale points out, the Affidavit nonetheless states that "*Reporting Detectives* interviewed a witness" on January 7, 2006. (ECF No. 109-3 at 6) (emphasis added). Since Dets. Evans and Smith were the only two detectives assigned to the cold case investigation, it is reasonable to infer that "Reporting Detectives" includes both Det. Smith and Det. Evans. It is well-settled that if law enforcement officers influenced or participated in the decision to institute criminal proceedings, they can be liable for malicious prosecution. *Halsey*, 750 F.3d at 297 (3d Cir. 2014). Thus, Det. Evans' assertion about his lack of personal involvement is unpersuasive.

Next, Dets. Evans and Smith contend that they are entitled to summary judgment because Carnevale's 2006 arrest was supported by probable cause:

> Here, Det. Evans and Det. Smith had probable cause to arrest Mr. Carnevale. Multiple courts made findings that support the existence of probable cause based on the evidence the Detectives had to arrest Mr. Carnevale in 2006. The record evidence in this case does not show that any of the evidence the detectives relied on in 2006 is incorrect or different now, despite the fact that Mr. Carnevale's conviction and sentence were vacated. Initially, the charges against Mr. Carnevale were "bound over" for trial after a preliminary hearing. In Pennsylvania, the Commonwealth must provide "*prima facie*" evidence at a preliminary hearing. A "'*Prima facie case*' has been defined by the Pennsylvania Supreme Court as evidence 'such that if presented at the trial in court, and accepted as true, the judge would be warranted in letting the trial go to the jury.'" And while the Third Circuit observed that many Pennsylvania courts state that a prima facie standard requires more evidence than a probable cause standard, some recognize the standards as "coterminous." Here, this point is relevant because, even if the two standards are coterminous, it shows that at least one judge found that there was probable cause to arrest Mr. Carnevale in 2006 based on the evidence collected by the Detectives.

(ECF No. 110 at 20) (internal citations omitted).

"Probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 788 (3d Cir. 2000) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). "Probable cause requires more than mere suspicion, however, it does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt." *Orsatti*, 71 F.3d at 482.

> Where, as here, a probable cause finding was made by a neutral magistrate in connection with a warrant application, a plaintiff must establish first, that the officer, with at least a reckless disregard for the truth, made false statements or omissions that created a falsehood in applying for a warrant, and second, that those assertions or omissions were material, or necessary, to the finding of probable cause. Omissions are made with reckless disregard only if an officer withholds a fact "in his ken" that any reasonable person would have known is the kind of thing the judge would wish to know, and the focus is thus facts and circumstances within the officer's knowledge at the time of the arrest, irrespective of later developments.

11

*Geness v. Cox*, 902 F.3d 344, 356-57 (3d Cir. 2018) (quotation modified).

Carnevale argues that Dets. Evans and Smith reviewed and were aware of the contents of the historical investigative file, including the three contemporaneous statements made by Shane Evans on the night of the fire. In those statements, Shane Evans described seeing an individual whose physical description did not match Carnevale's. Having reviewed the files from 1993, Dets. Evans and Smith also would have known that Shane Evans did not mention Carnevale in any of his three contemporaneous statements despite knowing him at the time. In fact, he expressly told each officer to whom he gave a statement that he did not see the suspect's face. (ECF No. 118 at 18.)

While knowledge of a report from a credible eyewitness can be sufficient to establish probable cause, *see Merkle*, 211 F.3d at 790, an officer's "[f]ailure to investigate is considered in tandem with the strength or weakness of the probable cause evidence." *Eckman v. Lancaster Cty.*, 742 F. Supp. 2d 638, 653 (E.D. Pa. 2010), aff'd, 515 Fed. Appx. 93 (3d Cir. 2013). Shane Evans' prior statements are entirely omitted from the Affidavit even though evidence in the record establishes that this information existed and was available to Dets. Evans and Smith. Both detectives testified at their depositions that they could not recall what specific documents they reviewed as part of their investigation. *See* ECF Nos. 130 ¶ 187; 120-34 at 33. At the same time, both of them also testified that they certainly would have reviewed the entire file and all documents included therein when assigned a case like the Columbia Apartments fire. *See, e.g.*, ECF Nos. 120-34 at 23 ("I would go and find that file and I would start reading the reports from the very beginning report, from -- which we called the initial report."); 120-35 at 27 ("I don't recall, you know, contents of those reports from 1993, but I'm certain that I read all of them at the time, whatever was available."). Det. Evans recalled seeing other specific documents from the historical case file,

12

including the composite sketch that was based in part on Shane Evans' contemporaneous statements to police. *See* ECF No. 120-34 at 71.

The Affidavit states that it is based on "personal observation" and "information received" on January 17, 1993, January 28, 1993, and January 27, 2006.[11] (ECF No. 121-2.) Dets. Evans and Smith represent that the information is believed to be reliable because the source (for instance, an eyewitness) is "presumed reliable" and because the affiants and/or other police officers "corroborated details of the information." (*Id.*) With respect to investigation by Dets. Evans and Smith, the Affidavit states that they interviewed an unidentified witness—now known to be Shane Evans—who stated that on the morning of the fire, he saw Carnevale exit the Columbia Apartments and walk quickly away. The witness returned home and shortly thereafter saw a fire in the same building. The witness saw Carnevale watching the fire, and when he walked over him, Carnevale immediately stated that he was "at the sandwich shop." (*Id.* at 3.)

Thus, Shane Evans is represented as "presumed reliable" in the Affidavit even though Dets. Evans and Smith either knew (or should have known, given their access to the 1993 investigative file) that the statements he made to other investigators just after the fire in 1993 were materially at odds with what he told the detectives thirteen years later. The Court therefore finds that there are genuine issues of material fact as to whether Dets. Evans and Smith had probable cause to initiate Carnevale's criminal prosecution.

Finally, Dets. Evans and Smith argue that the record lacks evidence that they acted maliciously or for a purpose other than to bring Mr. Carnevale to justice. (ECF No. 108 at 3.) "Actual malice in the context of malicious prosecution is defined as either ill will in the sense of

---

[11] According to the Affidavit, Shane Evans was interviewed on January 27, 2006. (ECF No. 121-2.)

spite, lack of belief by the actor himself in the propriety of the prosecution, or its use for an extraneous improper purpose." *Lee v. Mihalich*, 847 F.2d 66, 70 (3d Cir. 1988). "Malice may be inferred from the absence of probable cause." *Lippay v. Christos*, 996 F.2d 1490, 1502 (3d Cir. 1993). As the Court has already concluded that genuine factual disputes exist as to probable cause, actual malice may be inferred. *See Harvard v. Cesnalis*, 973 F.3d 190, 203 (3d Cir. 2020) (finding malice element met where defendant officer "mischaracterized the events and chose to omit crucial exculpatory information in the affidavit of probable cause he submitted to the magistrate judge.").

The Third Circuit has cautioned that district courts "should exercise caution before granting a defendant summary judgment in a malicious prosecution case where there is a genuine question of whether there was probable cause for the initiation of the criminal proceedings because, [g]enerally, the existence of probable cause is a factual issue.'" *Halsey*, 750 F.3d at 300 (quoting *Groman v. Twp. of Manalapan*, 47 F.3d 628, 635 (3d Cir. 1995)). The Court finds this to be such a case. As such, Dets. Evans and Smith's motion will be denied as to Carnevale's malicious prosecution claim.

### B. Fabrication of Evidence

Carnevale's Fourteenth Amendment claim in Count II alleges that Defendants fabricated evidence and used that fabricated evidence to bring about his prosecution and ultimately secure his conviction. Carnevale alleges Dets. Evans and Smith fabricated evidence by omitting Shane Evans' 1993 statements from the Affidavit. Further, he alleges that DiGiovanni "encouraged Evans and Smith to solicit false statements from a jailhouse informant who she used several times in the past to similarly falsify statements and by meeting (along with Evans and Smith) with Burns to provide him with facts of the case and instructions to get close to Mr. Carnevale." (*Id.* ¶ 107.)

14

1. *Shane Evans' 2006 statement*

Carnevale argues that Dets. Evans and Smith would not have arrested him without Shane Evans' 2006 statement and there "is no dispute" that the Affidavit was intentionally written to "make it appear as though Shane Evans gave one incriminating statement against Mr. Carnevale in 2006, when in fact he gave three prior statements contemporaneous to the fire that wholly exculpated Mr. Carnevale from these crimes." (ECF No. 118 at 23.)

In response, Dets. Evans and Smith argue that the record fails to demonstrate that any of the evidence presented against Carnevale was false or that it was offered in bad faith. Instead, they contend that Carnevale's claim is based solely on his personal disagreement with the testimony that was offered against him in the Affidavit and at trial. (ECF No. 110 at 23-24.)

To survive summary judgment, a plaintiff must show that the record "supports a conclusion that the allegedly fabricated evidence was so significant that it could have affected the outcome of the criminal case." *Halsey*, 750 F.3d at 295. Evidence that "is incorrect or simply disputed" is not fabricated. *Mervilus v. Union Cnty.*, 73 F.4th 185, 194 (3d Cir. 2023) (quoting *Halsey*, 750 F.3d at 295). "[F]or example, a witness's misidentification should not be regarded as a fabrication in the absence of persuasive evidence supporting a conclusion that the proponents of the evidence were aware that the identification was incorrect, and thus, in effect, offered the evidence in bad faith." *Halsey*, 750 F.3d at 295. To show bad faith, the plaintiff must point to "persuasive evidence [that the defendant] formulated or submitted false evidence willfully, knowingly, or with a reckless disregard for its truth." *Mervilus*, 73 F.4th at 194-95.

As discussed more fully above, there is record evidence to support Carnevale's contention that Dets. Evans and Smith were aware that Shane Evans' 2006 identification contradicted his three contemporaneous statements in 1993. A jury could reasonably rely on this evidence to

conclude that the omission of such information from the Affidavit that initiated the criminal proceeding against Carnevale was done in bad faith or with reckless disregard of the truth of Shane Evans' 2006 statement. Dets. Evans and Smith's motion therefore will be denied with respect to fabrication based on Shane Evans' statement.[12]

### 2. *Burns' testimony*

Count II also asserts a claim premised on Burns' testimony. The Court again notes that Carnevale's claims against DiGiovanni were previously dismissed to the extent they were based on: (1) DiGiovanni's alleged promise of lenience for Burns in exchange for his testimony and the failure to disclose such promise to Carnevale; and (2) DiGiovanni's alleged role in directing Burns to fabricate testimony and eliciting his false testimony at trial.

Carnevale nevertheless alleges that DiGiovanni, either by herself or through Dets. Evans and Smith, instructed Burns to get close to Carnevale and fed Burns information about Carnevale's case that Burns then used in his testimony. According to Carnevale, "when presented with a weak and inconsistent criminal case, and after her attempt to plea the case to victory failed, [DiGiovanni] searched for clues and corroboration in the form of a false confession from a jailhouse informant (i.e., Sean Burns) to continue to prosecute him instead of dropping the case." (ECF No. 134 at 2.)

While the record may well lack evidence expressly outlining the interactions between Defendants and Burns, the lack of *documentary* evidence about a fabrication of evidence claim is

---

[12] Dets. Evans and Smith argue in the alternative that they should be granted qualified immunity because Carnevale's allegations are too broad to sufficiently identify the contours of the right at issue. (ECF No. 110 at 17-18.) As the Third Circuit recently held, however, "Fabricating evidence to manufacture probable cause, as alleged here, eviscerates the possibility of a reasonable mistake. '[N]o reasonable officer would have covered up a lack of probable cause by [fabricating evidence].'" *Evans v. Newark City*, 2025 U.S. App. LEXIS 23625, at *17 (3d Cir. Sep. 12, 2025) (quoting *Pinkney v. Meadville*, 95 F.4th 743, 750 (3d Cir. 2024)). Dets. Evans and Smith are therefore not entitled to qualified immunity.

not necessarily dispositive. Carnevale contends that the record contains a wealth of circumstantial evidence that would allow a reasonable jury to infer the prosecution's need to strengthen their case against Carnevale, thereby increasing their chances of a conviction. According to Carnevale, this evidence includes: his lack of motive; the lack of physical evidence linking him to the fire; Shane Evans' three contemporaneous statements that failed to identify Carnevale despite knowing him at that time; Shane Evans' contemporaneous descriptions of the person he saw being inconsistent with Carnevale's physical description; the composite sketch developed from witness accounts and its failure to resemble Carnevale.[13] According to Carnevale:

> Knowing this information, DiGiovanni offered Mr. Carnevale a plea deal for 3.5 to 7 years' incarceration despite facing a possible triple consecutive life sentence, which he rejected.[14] And only after that DiGiovanni produced a serial jailhouse informant with whom she surreptitiously communicated (alone or with Evans and Smith) to say that Mr. Carnevale confessed his crimes, even though Mr. Carnevale has professed his innocence for over 30 years. None of these facts are conjecture or speculation.

(ECF No. 134 at 2-3.)

Defendants argue in their respective motions that Carnevale's allegations are impermissibly speculative and supported only by his own opinions. They contend that the record is devoid of evidence showing that any Defendant solicited false statements from Burns. Instead, they argue that Carnevale relies on his own unsupported theories in support of his claim.

But the record does indeed contain some evidence that conflicts with Burns and DiGiovanni's deposition testimony. For example, at her deposition, DiGiovanni denied offering Burns any favors or special treatment. (ECF No. 109-2 at 5, 8, 166.) Burns similarly denied being

---

[13] This list is not inclusive of all evidence cited by Carnevale in support of his claim.

[14] Dets. Evans and Smith also move to strike the Affidavit of Frank Walker, arguing that it is speculative and fails to establish a genuine fact in dispute. (ECF No. 142.) Mr. Walker represented Carnevale at his criminal trial and his affidavit addresses plea offerings made by DiGiovanni. The Court finds this argument unpersuasive and therefore declines to strike it.

promised or receiving anything from DiGiovanni. (ECF No. 109-18 at 23.) In some of his letters to DiGiovanni, however, Burns asks for her for help, (ECF No. 121-70 at 5) ("I don't know what you can do for me but please try."); requests that he be released from ACJ, (*Id.* at 34) ("No I don't want to go to another jail. I want R.O.R."); and references a bond reduction in exchange for testifying against another inmate, (*Id.* at 4) ("As for me, did you get a chance to talk to my Atty. Ms. Kearney about getting a bond reduction in place so that after I testify for you I won't have to stay here?"). Burns was also granted nominal bond during this same time period. *See* ECF No. 121-70. This presents a genuine issue of material fact as to nature of Burns and DiGiovanni's communications.[15]

As to Dets. Evans and Smith, as the only two detectives assigned to the Columbia Apartments fire cold case investigation, they would have been aware of the limited nature of the evidence against Carnevale. Armed with that information, the record clearly shows that Dets. Evans and Smith participated in at least one meeting with Burns—i.e., Burns' unofficial interview on March 1, 2007. *See* ECF No. 109-22. In a letter to DiGiovanni, Burns also stated:

> Det. Evans came to see me last Wednesday but we didnt [sic] talk much. I have some questions I need to ask concerning me testifying for you. Could you please send someone to talk to me about this so I know whats [sic] going on. I don't even know what day the trial is.
>
> Can you please send someone.

(ECF No. 121-70 at 32.) The record therefore shows that Dets. Evans and Smith had at least one opportunity to discuss Carnevale's case with Burns.

---

[15] While the letters from Burns are mostly undated, in a letter postmarked September 4, 2007, Burns writes: "While we were in the conference room last week . . . ." (ECF No. 121-17 at 2.) This conflicts with Burns' deposition testimony denying that he met with DiGiovanni at all. (ECF No. 121-12 at 9.) Whether these letters were received by DiGiovanni, as well as their ultimate relevance to the issues in the case, cannot be resolved by a dispositive motion.

Viewed in the light most favorable to Carnevale as the nonmoving party, the Court cannot conclude that Defendants are entitled to judgment as a matter of law. A reasonable jury could credit Carnevale's testimony and repeated denials that he ever discussed his case with Burns. In conjunction with the totality of the circumstantial evidence contained in the record, the jury could infer that one of the Defendants provided Burns with information, as they were the only ones with access to Carnevale's case file. The jury could also disregard Carnevale's testimony altogether and find the communications between Defendants and Burns were limited and appropriate. While the Court acknowledges the parties' competing attempts at framing the evidence, determining the credibility of testimony and assigning weight to evidence is a function reserved for the jury, far beyond the scope of summary judgment review. *Anderson*, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."). Because the record evidence, in its totality, could support a conclusion by the fact finder that Defendants provided case specific information to Burns to ensure that the case against Carnevale succeeded, summary judgment will be denied.

### C. Civil Conspiracy

Carnevale alleges that Defendants had an explicit agreement to generate and use fabricated evidence to bring about his prosecution and ultimate conviction. A plaintiff asserting a § 1983 conspiracy claim "must allege conspiracy with particularity." *Bieros v. Nicola*, 860 F. Supp. 223, 225 (E.D. Pa. 1994). That is, the allegations must be sufficient to "describe the general composition of the conspiracy, some or all of its broad objectives, and the defendant's general role in that conspiracy." *Rose v. Bartle*, 871 F.2d 331, 366 (3d Cir. 1989) (citation omitted). *See also Great W. Mining & Min. Co. v. Fox Rothschild LLP*, 615 F.3d 159, 178-79 (3d Cir. 2010) (holding that

19

§ 1983 conspiracy claimants must plead specific facts addressing the time the agreement was made, the period of the conspiracy, the exact parties to the agreement, and the object of the conspiracy); *Capogrosso v. The Supreme Court of the State of New Jersey*, 588 F.3d 180, 184-85 (3d Cir. 2009) ("[T]he rule is clear that allegations of a conspiracy must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action.").

While Carnevale argues that Defendants conspired, he fails to provide evidence of an explicit agreement, when it was formed, where it was entered into, or the specific acts that Defendants allegedly took in furtherance of it. Even viewed in the light most favorable to Carnevale, the evidence of record simply does not include sufficient factual evidence to support a conspiracy claim under § 1983.

Thus, Carnevale's § 1983 conspiracy claim at Count III will therefore be dismissed with prejudice as to all Defendants.

## V. Conclusion

For these reasons, the motions for summary judgment filed by Defendant Jennifer DiGiovanni (ECF No. 102) and Defendants Scott Evans and J.R. Smith (ECF No. 108) will be granted in part as to the conspiracy claim in Count III. The motions will be otherwise denied.

Appropriate orders will follow.

Dated: September 30, 2025                    BY THE COURT:

/s/ Patricia L. Dodge
PATRICIA L. DODGE
UNITED STATES MAGISTRATE JUDGE